**In re SOUTHERN INDUSTRIAL BANKING CORPORATION, Debtor.**

**Thomas E. DUVOISIN, Liquidating Trustee, Plaintiff,**

**v.**

**Louise S. EVANS, Defendant.**

**Bankruptcy No. 3–83–00372.**
**Adv. No. 3–85–0635.**

United States Bankruptcy Court, E.D. Tennessee.

Aug. 19, 1993.

John A. Lucas & Jeffrey S. Norwood, Hunton & Williams, Knoxville, TN, for plaintiff.

Bacon, Jessee, Perkins & Swanson, Morristown, TN, for defendant.

## MEMORANDUM

RALPH H. KELLEY, Chief Judge.

Southern Industrial Banking Corporation (SIBC) was an industrial loan and thrift company. The defendant bought a 30–day investment certificate from SIBC. A few days after the certificate matured, SIBC paid the defendant the face amount plus interest. SIBC filed bankruptcy the next month. The plaintiff is the trustee under SIBC's Chapter 11 plan. He brought this suit against the defendant to recover the payment as a preferential transfer.

Subsection (b) of Bankruptcy Code § 547 defines a preferential transfer. Subsection (c) defines seven exceptions. 11 U.S.C.A. § 547 (West 1993).

The defendant has moved for summary judgment. She argues that the payment is protected by the exception for payments in the ordinary course of business. The exception protects a transfer made to pay a debt if:

(1) the debt was incurred in the ordinary course of business or financial affairs of both the debtor and the creditor; and

(2) the transfer was made in the ordinary course of business or financial affairs of both the debtor and the creditor; and

(3) the transfer was made according to ordinary business terms; and

(4) the transfer was made within 45 days after the debt was incurred.

11 U.S.C.A. § 547(c)(2) (West 1979).

The trustee contends that the exception does not apply because SIBC's owners were operating it as a Ponzi scheme when the defendant bought the investment certificate and when she cashed it in.

Judge Paine previously rejected the Ponzi scheme argument. *DuVoisin v. Anderson (In re Southern Industrial Banking Corp.)*, 87 B.R. 524, 17 Bankr.Ct. Dec. 1015 (Bankr.E.D.Tenn.1988). However, the trustee argued that the Sixth Circuit Court of Appeals had implicitly overruled Judge Paine's reasoning. This court agreed. In *First Federal v. Barrow*, the Sixth Circuit held that the exception did not apply, even though the debtor was a legitimate business, because it was operating in a "totally unorthodox and illegal" manner. *First Federal v. Barrow*, 878 F.2d 912, 918 (6th Cir.1989).

This court is restricted to dealing with only one question. Was SIBC's payment outside the ordinary course of business because SIBC was a Ponzi scheme or was operating in a totally unorthodox and illegal manner?

The court can grant the defendant partial summary judgment on this question only if there is no genuine issue of material fact, and based on the undisputed facts, the law entitles the defendant to judgment in her favor. FED.R.BANKR.PROC. 7056 (West 1984).

The trustee filed his own affidavit in support of the Ponzi scheme argument. In his affidavit the trustee testifies as follows.

Jake Butcher controlled the United American Bank of Knoxville. His brother C.H. Butcher, Jr., controlled the City and County Bank of Knox County. In November 1, 1982 the FDIC began a coordinated examination of the banks owned by the Butchers.

C.H. Butcher, Jr., owned or controlled a large amount of SIBC's stock. He was a director of SIBC and chairman of the board.

SIBC was primarily in the business of making loans secured by automobiles or second mortgages on homes. It also bought commercial paper from furniture and appliance dealers. Beginning in 1981 at the latest, the Butchers began a campaign to increase investments in SIBC so that they could use it to make or hide large commercial loans to themselves and their associates. They decided to use SIBC because it was largely unregulated and unsupervised by the state.

The table below shows the rapid increase in the total of investment certificates, passbook accounts, and VIP accounts.

| DATE | TOTAL INVESTMENTS (millions) | NET CHANGE (millions) |
|---|---|---|
| 12/79 | $13.190 | $ 4.893 |
| 12/80 | $22.423 | $ 9.232 |
| 12/81 | $43.100 | $20.677 |
| 12/82 | $71.523 | $28.423 |
| 01/83 | $80.878 | $ 9.355 |

To achieve this increase, the Butchers used a massive advertising campaign and above-market interest rates. For example, in December 1982, SIBC offered investors a return of 19.29% per annum. The media campaign reached its height during the preference period—December 10, 1982 through March 10, 1983.

In his opinion on insolvency, Judge Bare found that SIBC was insolvent on November 30, 1982 by almost $12,000,000. Judge Bare found that SIBC remained insolvent throughout the preference period and was insolvent on March 10, 1983 by almost $20,-000,000. *DuVoisin v. Anderson (Southern Industrial Banking Corp.)*, 71 B.R. 351 (Bankr.E.D.Tenn.1987).

The last paragraph of the trustee's affidavit is argument instead of a statement of facts. The trustee argues as follows. During the preference period SIBC was unable to pay investors from existing assets because of its massive insolvency. The only way SIBC could pay investors was by soliciting new investments and using the new investors' money to pay the earlier investors. This made SIBC the same as a Ponzi scheme; it used money from later investors to pay earlier investors, and when the business went bankrupt, the later investors who didn't have a chance to get paid were stuck with the loss.

The trustee's affidavit relies heavily on Judge Bare's opinion on insolvency, *DuVoisin v. Anderson (Southern Industrial Banking Corp.)*, 71 B.R. 351 (Bankr. E.D.Tenn.1987).[1]

The defendant's response to the Ponzi scheme argument also relies on Judge Bare's opinion. Judge Bare found that SIBC had income from interest on installment loans; during January through November 1982, SIBC collected interest totalling about $5,300,000. The defendant uses this finding of fact to make two points.[2]

First, it would have taken a large amount of installment loans to generate this much interest in eleven months. The defendant relies on the district court's opinion on another question for the proposition that the installment loans totalled about $40,000,000 at the time of SIBC's bankruptcy.

At the time of the filing of the Chapter 11 petition, roughly one half of SIBC's loans were in the form of consumer installment obligations which it had purchased from retailers. The other half were more or less unsecured loans which had been made to individuals associated with C.H. Butcher, a principal stockholder in SIBC. Of the approximately $40,-000,000 of loans in this category....

*DuVoisin v. Anderson (In re Southern Industrial Banking Corp.)*, 59 B.R. 978, 981 (E.D.Tenn.1986).[3]

Second, SIBC's cash flow would have included not only the interest payments but also principal payments on the installment loans.

Judge Bare's opinion on insolvency also states that SIBC had income from loan fees

1. The defendant has not challenged the trustee's affidavit on the ground that it is not based on personal knowledge.

2. The court is relying on the brief filed by defendant's lawyers in *Duvoisin v. Mallory,* Adv. Proc. No. 3–85–0667. The arguments carry over

since they are based on SIBC's business before bankruptcy.

3. The trustee has not objected to the defendant's reliance on Judge Bare's or Judge Edgar's statement of the facts.

and insurance commissions. But the opinion does not reveal the amount of this income for 1982 or any other year.

The defendant dealt with the branch of SIBC in Morristown, Tennessee. She has filed the affidavit of the branch manager in support of her motion for summary judgment. Some of his statements are relevant to the question now before the court. The branch manager testified as follows.

SIBC routinely accepted deposits for accounts known as passbook accounts and VIP accounts. Both accounts earned interest. The agreements for these accounts allowed SIBC to require a 90–day notice before withdrawal, but SIBC did not ordinarily require any notice. SIBC employees regularly told holders of VIP accounts that they were payable on demand. SIBC routinely paid the holders of both passbook and VIP accounts on demand.

SIBC sold investment certificates that were for various lengths of time. The interest rate varied according to the term of the certificate. When a certificate matured, the customer could surrender it to SIBC, and SIBC would pay the customer the principal amount of the certificate plus the interest. If the customer wanted to reinvest, she could surrender the certificate, and SIBC would issue a new certificate for the amount the customer wanted to invest. The new certificate would provide for payment of interest at the current rate offered by SIBC.

### DISCUSSION

In a Ponzi scheme the crooks may set up a regularly operating business, but its purpose is to lure investors into the scheme; the crooks know the business will not make enough money to repay the investors. *Henderson v. Buchanan (In re Western World Funding, Inc.)*, 52 B.R. 743 (Bankr. D.Nev.1985) *aff'd in part, rev'd in part, Buchanan v. Henderson*, 131 B.R. 859 (D.Nev.1990), *rev'd, Henderson v. Buchanan*, 985 F.2d 1021 (9th Cir.1993).

Other Ponzi schemes go down the scale from a few transactions to no legitimate business. *See Wootton v. Barge (In re Cohen)*, 875 F.2d 508, 19 Bankr.Ct.Dec. 883, 21 Collier Bankr.Cas.2d 554 (5th Cir. 1989); *Merrill v. Abbott (In re Independent Clearing House Co.)*, 41 B.R. 985, 12 Bankr.Ct.Dec. 44, 11 Collier Bankr.Cas.2d 196 (Bankr.D.Utah 1984), *aff'd in part, rev'd in part*, 77 B.R. 843 (D.Utah 1987) (en banc) [4]; *Rafoth v. Bailey (In re Baker & Getty Fin'l Serv., Inc.)*, 88 B.R. 792 (Bankr.N.D.Ohio 1988).

■ If the debtor was a Ponzi scheme, a transfer to pay an investor is not protected by the exception for payments in the ordinary course of business. The creditor loses even if the debtor appeared to be a legitimate business, and the creditor didn't do anything to force the payment. The best explanation for this result may be the simplest. The exception applies to payments by a real business, not to payments by a fake business set up to defraud people.

■ The trustee sometimes seems to be arguing that SIBC was a Ponzi scheme simply because it was insolvent. Every business that is balance-sheet insolvent is not a Ponzi scheme. The outcome may be the same—earlier debts paid and later debts not paid—but that does not make an insolvent business a Ponzi scheme. Of course, there is more to the trustee's argument.

The trustee's affidavit explains the alleged Ponzi scheme as follows. SIBC received money from investors who bought investment certificates or opened passbook accounts. The people in control of SIBC, the Butcher brothers, were using large amounts of the money for "loans" to themselves and their associates, loans that they knew were not likely to be repaid. The Butchers knew that SIBC could not repay the investors from honest earnings, but they used a massive advertising campaign and above-market interest rates to lure

---

**4.** With regard to the fraudulent transfer issues, the bankruptcy court's decision was reversed in part and affirmed in part in *Merrill v. Dietz (In re Universal Clearing House Co.)*, 62 B.R. 118 (D.Utah 1986).

more and more investors to SIBC. They did this to get money from the later investors to pay the earlier investors and to provide themselves more money for their personal use. The trustee contends that these facts show a Ponzi scheme.

The court can assume that this statement of facts is correct. The Ponzi scheme cases still do not apply to SIBC. In his affidavit the trustee admits that SIBC had been a legitimate business. He does not deny that it continued its legitimate small loan business. The small loan business was a large business that generated a substantial income and cash flow. The undisputed facts show that SIBC was not just a Ponzi scheme or an element in a Ponzi scheme.

This is where the Sixth Circuit's decision in *First Federal v. Barrow* becomes important. *First Federal v. Barrow,* 878 F.2d 912 (6th Cir.1989). The debtor in *First Federal v. Barrow* was not just a Ponzi scheme or an element in a Ponzi scheme. The debtor was a mortgage company that arranged and serviced mortgages. When the company arranged a mortgage, it was supposed to receive the money from the lender, put it in a separate account, and pass it on to the borrower. The company also serviced mortgages. It was supposed to receive payments from a borrower, put them in a separate account, and pass them on to the lender. The company had money coming in from other services. The company developed a cash flow problem and began using one bank account for all deposits and payments. In the Sixth Circuit's words, this method of operating was "totally unorthodox and illegal." *First Federal v. Barrow,* 878 F.2d 912, 918 (6th Cir.1989). The court held that the payments to the lenders were not in the ordinary course of the mortgage company's business.

The court might say that the mortgage company's method of operating had the same effect as a Ponzi scheme. It hid the mortgage company's financial problems, and the loss was going to fall on the lenders who were to be paid last and their borrowers.

However, there were some key differences. The mortgage company was not set up to be and did not become a scheme for the operators to steal money from the business or its customers. The business was not soliciting new customers just to get money to pay old customers. The mortgage company was a legitimate business that went awry because of financial problems.

The trustee gives a different explanation of the problem with SIBC: the Butchers and their associates were using SIBC to raise money for their personal use, and were taking so much money from SIBC that it was bound to fail and leave some creditors unpaid. This may have been unorthodox and illegal, but the effect was different from the mortgage company's wrongdoing in *First Federal v. Barrow.*

The mortgage company's key duty was to keep the money it received in separate accounts and pass it along only to the creditor or the borrower who was supposed to receive it. When the mortgage company started using one account for all the money, it corrupted the business completely. The mortgage company's mishandling of the money tainted every transaction, especially payments to lenders. According to the trustee, SIBC was more like a Ponzi scheme in which the overall business was used for fraud. The court, however, has already concluded that the undisputed facts distinguish SIBC from a Ponzi scheme.

Neither logic nor experience requires the court to say that SIBC was one or the other, either a Ponzi scheme or a business that operated in a totally unorthodox and illegal manner. The court must be careful not to over-extend the reasoning of the Ponzi scheme cases and *First Federal v. Barrow. See Jobin v. McKay (In re M & L Business Mach. Co.),* 155 B.R. 531, 24 Bankr.Ct.Dec. 464 (Bankr.D.Colo.1993). There are at least three underlying reasons for the result in the Ponzi scheme cases and *First Federal v. Barrow.*

The ordinary course exception may encourage creditors to continue normal dealings with debtors in financial trouble. 1 DAVID G. EPSTEIN ET AL., BANKRUPTCY § 6–29

at 608 (1992). This leads to the theory that the exception should not apply to payments by a Ponzi scheme or a totally unorthodox and illegal business, because that would aid their survival. The court finds this theory unconvincing. The court doubts that denying creditors the benefit of the exception will help put an early end to a Ponzi scheme or a totally unorthodox and illegal business. *American Continental Corp. v. All Preference Defendants (In re American Continental Corp.),* 142 B.R. 894 (D.Ariz.1992).

The second theory is that the exception should not apply because it would amount to continuing the effect of the debtor's wrongdoing. On the other hand, denying creditors the benefit of the exception levels out the loss caused by the debtor's wrongdoing.

Leveling out the loss among creditors cannot by itself justify denying the exception, since it is the overall purpose of the preference law. The key argument is that applying the exception would continue the effect of the debtor's wrongdoing.

This makes some sense in Ponzi scheme cases. The earlier investors get paid, and the loss falls on the later investors. If the exception applies, the earlier investors who were paid in the 90-day preference period keep their money, and the investors who were not paid bear the loss. Denying the exception reverses this result to some degree. *But see Merrill v. Abbott (In re Independent Clearing House Co.),* 77 B.R. 843, 874–75 (D.Utah 1987) (en banc) (leveling effect too minor to justify denying the exception).

Of course, payments by SIBC did not necessarily go to earlier investors ahead of later investors. Over a long period of time this may have been true, but in the short run, payments should have been mixed between earlier and later investors. This

must be true because investors could buy investment certificates for different time periods and could routinely collect passbook accounts that did not have due dates.

Furthermore, in *First Federal v. Barrow* the debtor's actions wronged two classes of customers at once. When the mortgage company failed, it left lenders without payments that their borrowers had already made and left the borrowers without credit for the payments. Multiply this result by a large number of borrowers and lenders, and leveling out the loss makes sense. SIBC does not involve this kind of problem.

The final theory is that payments by a Ponzi scheme or a totally unorthodox and illegal business are the same as intentional preferences. *See, e.g., Mazer v. Broadway Southwest (In re Roemig),* 123 B.R. 405 (Bankr.D.N.M.1991); *Clark v. A.B. Hirchfeld Press, Inc. (In re Buyer's Club Markets, Inc.),* 123 B.R. 895 (Bankr.D.Colo. 1991).[5]

This theory makes some sense with regard to a Ponzi scheme. The operators of a Ponzi scheme clearly intend to prefer the earlier investors. They intend to keep the scheme going by paying the earlier investors with money from later investors.

This theory does not especially make sense when the debtor was a real business, not just a Ponzi scheme or an element in a Ponzi scheme, and the payments were made when due. When a real business pays debts as they become due, the payments are not the same as intentional preferences to the creditors who were paid.

None of the underlying reasons for the result in the Ponzi scheme cases and *First Federal v. Barrow* justify the same result on the undisputed facts of this case.

The Arizona district court reached the same result in a case involving very similar

---

5. This court has treated *First Federal v. Barrow* as extending the reasoning of the Ponzi scheme cases, but it might be explained purely as an intentional preference case. The court of appeals said that the debtor was intentionally preferring some creditors. The "totally unorthodox and illegal" language was supported by citation to a case; the court described the case as denying the exception because the payments resulted from *the debtor's* pre-bankruptcy planning. The dissenting judge thought that the majority was finding the facts on the question of whether the debtor was intentionally preferring some creditors. *First Federal v. Barrow,* 878 F.2d 912, 914, 918 & 920 (6th Cir.1989).

facts, but its reasoning was somewhat different. *American Continental Corp. v. All Preference Defendants (In re American Continental Corp.),* 142 B.R. 894 (D.Ariz.1992).

The court will enter a partial summary judgment for the defendant and against the trustee on the argument that the exception in § 547(c)(2) does not apply because SIBC operated as a Ponzi scheme or in a totally unorthodox and illegal manner.