**In re MARK BENSKIN & CO., INC., Debtor.**

**George EMERSON, Trustee, Plaintiff,**

v.

**Ray MAPLES and Brenda Maples, Defendant/Cross Defendants,**

**and**

**Beverly Poston, Defendant/Intervenor/Cross Plaintiff.**

**Bankruptcy No. 89–22793–B.**

**Adv. No. 91–0157.**

United States Bankruptcy Court, W.D. Tennessee, W.D.

Dec. 7, 1993.

Elizabeth Collins and Michael McLaren, Memphis, TN, for Trustee.

David Sullivan, Memphis, TN, for Beverly Poston.

W. Clark Washington, Memphis, TN, for Ray and Brenda Maples.

## AMENDED MEMORANDUM OPINION

WILLIAM H. BROWN, Bankruptcy Judge.

In this adversary proceeding, the Trustee filed a complaint, now amended, against Ray and Brenda Maples, seeking to avoid certain transfers from the debtor to the Maples as fraudulent conveyances under 11 U.S.C. § 548. The issues raised in that complaint are core under 28 U.S.C. § 157(b)(2)(H). Beverly Poston [1] was allowed to intervene in this adversary proceeding, and she filed a cross claim against the Maples, in which Beverly Poston asserted trust, fraud and conversion theories in an effort to obtain a judgment against the Maples for $33,100.00 plus accrued interest from December 8, 1988, and punitive damages. The Poston claims involve determinations of transfer avoidance, property of the estate and allowance of claims against the estate and are core pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (H). The parties consented to a trial without a jury, and the Court will enter a final order on all issues, subject to appeal pursuant to 28

1. Beverly Poston is now deceased and her daughter and executrix Marnie Fernandez has been substituted.

U.S.C. § 158.[2] This opinion contains findings of fact and conclusions of law pursuant to F.R.B.P. 7052. The Court issued its original opinion on November 12, 1993, as an accommodation to counsel who had a trial in November in another similar adversary proceeding, and the Court reserved the opportunity to make revisions in that opinion. A final order and judgment will be entered at this time.

### HISTORY OF THE CASE

As a background to this adversary proceeding, two involuntary bankruptcy petitions were filed against the debtor and against a related debtor, Mark Stephen Benskin, on April 14, 1989. Orders for relief were subsequently entered pursuant to 11 U.S.C. § 303(h), and the Trustee filed numerous avoidance proceedings. It has been established clearly in the proof that Mr. Benskin conducted his business as a sole proprietorship ignoring corporate formalities. Generic references to the debtor in this opinion may refer to either debtor. Both debtors were substantially engaged in an illegal Ponzi scheme, through which the debtors obtained funds from some clients, such as Beverly Poston, under the false pretense of making investments for them. The debtor engaged in some legitimate business activity, for example, when it handled restricted accounts such as IRAs. However, illusory profits were often paid to some clients, such as the Maples, out of the funds paid in by new clients, such as Beverly Poston, and that is frequently the case in such schemes. *See, e.g., Rosenberg v. Collins*, 624 F.2d 659, 663–64 (5th Cir.1980); *Emerson v. Marty, et al. (In re Mark Benskin & Co., Inc.)*, 135 B.R. 825 (Bankr.W.D.Tenn.1991); *compare, Duvoisin v. Evans (In re Southern Industrial Banking Corp.)*, 159 B.R. 224 (Bankr. E.D.Tenn.1993) (where Judge Kelley distinguished legitimate business activity from an overall Ponzi scheme). Mr. Benskin and the debtor corporation pled guilty to a multi-count federal indictment. *U.S. v. Benskin*, 926 F.2d 562 (6th Cir.1991). In an earlier opinion in this case, the Court denied the Trustee's action seeking a preferential transfer avoidance and recovery against different parties due to a failure of proof and allowed a tracing by another intervenor so as to give that intervenor a recovery against that defendant. *Emerson v. Marty*, 135 B.R. at 832. However, the Court

> observe[d] that this result may be unique to this proceeding. Had the Trustee carried the burden of proving all elements of § 547(b), the Marty transfer would have been an avoidable preference and, as such, it would have been property of the estate. Then, a different tracing methodology *may* have been employed. *See, e.g., First Federal of Michigan v. Barrow*, 878 F.2d 912, 916 (6th Cir.1989). Further, [the intervenor] would have been competing as an unsecured creditor for [a] pro-rata share of the bankruptcy estate. Therefore, this opinion should not be used as a *per se* ruling that all intervenors necessarily would prevail against the bankruptcy Trustee.

*Id.* at 834.

The instant adversary proceeding presents the Court with a distinct confrontation between the federal bankruptcy doctrine of equality of distribution for the benefit of all unsecured creditors and state law equitable or legal principles, including specific creditor avoidance powers, that favor an innocent third party who lost money due to a debtor's fraud or deception. As predicted in the Court's prior *Marty* decision in this case, intervenors, such as the intervenor in this proceeding, may not always prevail in this type of confrontation. The Court has analyzed the totality of the particular facts in this adversary proceeding and the result, while not one that rests comfortably with the Court's sense of equity toward Beverly Poston, is dictated by the particular facts. This is a proceeding where the equities may be

**2.** It could be concluded that the dispute between the Poston estate and the Maples is a non-core but otherwise related proceeding, as the Poston estate seeks a monetary recovery from the Maples, who are not debtors under Title 11. However, the gravamen of the dispute is whether the Maples owe the Poston estate or the bankruptcy estate and that determination requires decisions in core issues. Moreover, the Court understands that the parties consented to a final judgment from this Court, subject to the parties' appeal rights.

argued strongly for both the Trustee and Beverly Poston and a result may be justified for either. After a balancing of all factors, the Court must decide in favor of the Trustee.

## DISCUSSION

The Trustee's complaint pleads a cause of action under 11 U.S.C. § 548 that provides—

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction or was about to engage in business or a transaction for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Specifically, the Trustee seeks to avoid and recover transfers made to the Maples within one year before the bankruptcy filing, and those transfers total $53,100.00.[3] *See* Trustee's Amended Complaint. The Trustee's complaint relied upon the transfers being made with the debtor's "actual intent to hinder, delay, or defraud" other creditors. 11 U.S.C. § 548(a)(1). The proof demonstrated that the debtor, and its principal Mark Benskin, knew when paying the Maples that there were insufficient assets to satisfy other creditors. The debtors' intent to defraud creditors was established by the guilty pleas to the related criminal charges and preclusive effect may be given to those guilty pleas as factual findings to the extent that the debtors' intent to defraud creditors is required in this adversary proceeding. The indictment to which Mr. Benskin and his company pled guilty is Exhibit 12 to the evidentiary deposition of Mr. Benskin, and it clearly alleges a scheme by both Mr. Benskin and his solely controlled company to defraud creditors, including a scheme to control the investors' funds and to use those funds for the debtors' benefit. By pleading guilty the debtors admitted, among other things, misappropriation of customers', including Beverly Poston's, funds and misrepresentation to customers of the status of or return on their investments. Moreover, the Trustee admitted that the debtor obtained Beverly Poston's funds by fraud. *See* Stipulated Facts.

In reality, Mr. Benskin and his company maintained no separate client accounts or trust accounts. The evidence clearly established that the debtor used its "escrow" bank account at National Bank of Commerce in Memphis as a general account. Client funds were commingled and deposited there, and clients were paid from that account. Howev-

---

3. The transfers subject to avoidance are:

checks dated:

| | | |
|---|---|---|
| 4/18/88 | $10,000.00 | to Ray Maples (Ex. 7) |
| 12/2/88 | 25,000.00 | to Ray Maples (Ex. 9) |
| 12/2/88 | 5,600.00 | to Ray or Brenda Maples (Ex. 10) |
| 12/2/88 | 1,000.00 | to Sandra Maples and endorsed for deposit by Ray Maples (Ex. 11) |
| 12/7/88 | 1,500.00 | to Kaye Maples and endorsed for deposit by Ray Maples (Ex. 8) |
| 1/12/89 | 10,000.00 | to Brenda Maples (Exs. 6, 24) |
| | $53,100.00 | |

er, Mr. Benskin's personal and operating expenses were also paid routinely from that account. In no manner did the debtor treat the "escrow" account as a trust account nor did the debtor segregate client funds. As will be seen, the facts that the debtor controlled the account, that no funds were segregated, and that no separate identity of client funds was maintained will be crucial to the analysis of Beverly Poston's claims.

When the debtor did invest in a nonrestricted account, trades of those accounts resulted in checks payable to the debtor rather than to the debtor's customers. Only when the debtor invested in restricted accounts did the debtor place its customer's name on the account. The debtor did occasionally use restricted accounts, for example to rollover IRA accounts for some customers, such as Danny Livingston, a witness in this proceeding.

The debtor routinely issued false account statements to its customers. The use of such false statements led the customers to believe that investments had been made and that returns were being realized when such information had been fabricated as a part of the debtor's illegal scheme. *See, e.g.,* Exhibit 1, stating that an investment of $137,150.34 from Beverly Poston had been deposited to American Capital Securities Fund "as requested by Ms. Beverly Poston." No such deposit had been made on her behalf or in her name. As to American Capital, the debtor was not an agent for American Capital, which was the parent to several mutual fund managed accounts. The debtor would invest in American Capital through another company in Jackson, Mississippi. The debtor's investments in American Capital were never in the customer's name, and the American Capital investments also were not segregated into customer accounts.

Mr. Benskin testified that he met with Beverly Poston and her daughter Marnie Fernandez in the Poston home and that it was his suggestion that she invest in American Capital. He denied that Beverly Poston or Marnie Fernandez instructed him to only invest in American Capital or in government funds. Mr. Benskin further stated that there was no written trust agreement with Mrs. Poston and that he was given total discretion by Mrs. Poston to invest her funds. Quite obviously, Mrs. Poston did not agree to allow Mr. Benskin to convert her funds but it is evident that he did so. He testified that his company's account statements to Mrs. Poston were false, including the one dated November 17, 1988, showing an account balance of $137,150.34 invested in American Capital. Ex. 1. This admittedly false statement somewhat belies Mr. Benskin's denial that he was instructed to invest in American Capital for Mrs. Poston.

Mrs. Poston gave two cashier's checks to the debtor totalling $137,150.34, and they were deposited in the escrow account, commingled with three other deposits, on November 17, 1988. Exs. 2 & 4. As stated, those funds were not invested exclusively for Mrs. Poston; rather, the debtor used them as the debtor used other customer funds, for personal and operating expenses, for general investments in the market and for payment to other customers such as the Maples. Mrs. Poston did not have a restricted account, such as an IRA, that would have assured investments in her name.[4]

### AVOIDANCE AND LIABILITY OF TRANSFEREES

■ Looking first to the Trustee's fraudulent conveyance claims against the Maples, the Trustee has met his burden of proof by a preponderance of the evidence[5] that the Maples were transferred funds within the one year of the bankruptcy filings and that these transfers were made voluntarily by the debtor with actual intent to hinder, delay or defraud other creditors to whom the debtor was then obligated. As stated, the debtors' guilty pleas established that. Moreover, the totality of the proof established the existence of an illegal scheme that had at its heart a fraudulent motive. Included in the proof was

---

4. In contrast, Danny Livingston testified that he instructed Mark Benskin to place his funds in an IRA and the debtor did so.

5. The evidence is actually clearly and convincingly in favor of the Trustee's § 548 avoidance and recovery.

testimony from Allen Exelbierd, the Trustee's public accountant, who demonstrated that his review of the debtor's deposit slips and checks for 1986 through 1988 revealed an excessively large "fee" taken by the debtor from customers' "investment" funds, an inconsistency between the checking account transactions of the debtor and the false statements issued to customers, a failure of the debtor to invest all of its customers' funds, and a use of the debtor's escrow account for non-customer purposes. The Court does not believe that any of the parties deny the debtor's fraudulent intent and there can be no doubt of it. As one court observed "[t]he statutory language makes it plain that one can infer an intent to defraud from the mere fact that Debtors were operating a Ponzi scheme." *Raforth v. The First National Bank of Barnesville, et al. (In re Baker & Getty Financial Services, Inc.)*, 98 B.R. 300, 308 (Bankr.N.D.Ohio 1989).

Therefore, under § 548(a)(1) the transfers from the debtor to the Maples are avoidable. However, to illustrate the overwhelming justification for avoidance, the Court also has analyzed constructive fraud under § 548(a)(2). For purposes of this subsection it is first necessary to show that the debtor/transferor received "less than a reasonably equivalent value in exchange for" the transfers. 11 U.S.C. § 548(a)(2)(A).

■ The Maples had invested, between September 1984, and November 7, 1987, a total of $7,500.00 with Mark Benskin. Prior to § 548's one year reach back period, the Maples had been paid a "return" in excess of their "investments." Exhibit 25, Interrogatory Answers of Brenda Maples. During the one year reach back period the Maples, in their names or in the names of their dependent children, received $53,100.00 from the debtor. The two checks to the children were endorsed by and controlled for deposit by Ray Maples. *Supra* note 3. There were no new deposits by the Maples to justify such a return. Quite simply, the debtor fabricated a "profit" in the Maples' account and paid it to them upon their requests for withdrawals. The debtor received no value in exchange for the transfers to the Maples within that one

year time period. Obviously, *no* value is not reasonably equivalent value.

The second step under § 548(a)(2) presents alternatives. A trustee may show that the debtor was insolvent at the time of the transfer or became insolvent as a result. 11 U.S.C. § 548(a)(2)(B)(i). Or, a trustee may prove that the debtor engaged in business with unreasonably small capital. 11 U.S.C. § 548(a)(2)(B)(ii). Or, a trustee may prove that the debtor intended to or believed that it would incur debts beyond the debtor's ability to repay. 11 U.S.C. § 548(a)(2)(B)(iii). Here, this trustee has established each of these elements. Mark Benskin admitted that he and his company were insolvent throughout 1988. Mr. Exelbierd's review indicated insolvency from January 1, 1988, through April 18, 1989. The testimony of Mr. Benskin, of Mr. Exelbierd, and documentary proof also established that when the payments were made to the Maples the debtor was unable to pay other obligations that it incurred. Moreover, the fact that the debtor operated primarily if not exclusively on fraudulently obtained funds establishes that the debtor had little if any legitimate operating capital. It would seem axiomatic that the debtor was operating its business with unreasonably small capital.

■ In summary, the Trustee has established all necessary § 548(a) elements to avoid the transfers to the Maples. The Maples only "defense" is actually their attempted justification that their withdrawals were represented to them to be their "profits" on investments. As the profits were falsified by the debtor, there is no such justification for the Maples' withdrawals. Counsel for the Maples also argued that the check dated April 18, 1988, (*supra* note 3) should not be avoidable as it fell outside the one year prior to the entry of the order for relief on June 12, 1989. However, § 548(a) allows avoidance of transfers made within one year of the "date of the filing of the petition." 11 U.S.C. § 548(a). Section 101(42) of the Code defines "petition" to mean "petition filed under section 301, 302, 303 or 304 of this title, commencing a case under this title." In an involuntary case such as this one, the statutory language mandates that the trigger date

for avoidance reach back is the filing date rather than the date of the order for relief.

While there was some proof that the Maples at some point knew that Mr. Benskin was under investigation by law enforcement authorities, there is no proof that the Maples knew of the debtor's specific fraudulent acts. The intervenor established that the Maples were paid a profit far in excess of their investment [6] and that they paid taxes in 1988 on a zero basis return of $46,668.00 from the debtor. Ex. 19. There was proof upon which a factual basis exists for the Court to be dubious of the Maples' avowed lack of suspicion as to the debtor's business activities, but the Court's concern does not aid Beverly Poston in that there is insufficient proof to find that the Maples knew that the source of their withdrawals was other customers' money. Section 548 does not, moreover, test the knowledge or intent of the transferee. It is the debtor/transferor's fraudulent intent or constructive fraud that is at issue and has been proven here.

Having determined that the transfers were fraudulent and avoidable, § 550 addresses the liability of the transferee. The Trustee is entitled to recover the value of the transfers and this Court finds that the value can be returned to the bankruptcy estate only if the Trustee obtains a judgment for the avoided transfers, plus prejudgment interest at the federal rate [7] from the date of the filing of this complaint. The judgment will be joint and several against Ray and Brenda Maples and it shall include the amount of the two checks totalling $2,500.00 made payable to Sandra and Kaye Maples, but endorsed and deposited by Ray Maples. Therefore, the judgment against Ray and Brenda Maples as initial transferees under 11 U.S.C. § 550(a)(1) is for $53,100.00, plus prejudgment interest at the federal rate from the date of filing of the Trustee's complaint.

### LIABILITY TO INTERVENOR

As to the intervenor's claims against the Maples, the Poston estate asserts that it should prevail against the first $33,100.00, plus accrued interest and punitive damages, recovered from the Maples. Thus, the intervenor's recovery would be given superiority over the Trustee's avoidance recovery if the intervenor's theory is accepted. The Poston estate alleges that a fiduciary obligation was created when Beverly Poston surrendered her funds to Mark Benskin with instructions to deliver the funds to American Capital.

An express trust is asserted and the Poston estate relies in part on its belief that Mark Benskin held himself out to be an agent for American Capital. The Court does not find that "[t]his was an express trust in every way." *In re Elrod,* 42 B.R. 468, 473 (Bankr.E.D.Tenn.1984) (*citing* Bogert, LAW OF TRUSTS 23 (5th Ed.1973) for elements of an express trust). The Court understands that an express trust does not require a writing. *Kopsombut–Myint Buddhist Center v. State Board of Equalization,* 728 S.W.2d 327 (Tenn.App.1986). The testimony of Beverly Poston establishes that she relied upon Mark Benskin to invest her funds but she was not relying upon his alleged agency with American Capital. Rather, she learned of Mr. Benskin through family and friends "who had used Mr. Benskin as an advisor, consultant, whatever. And so we decided that it might be wise to talk with him and consider turning that over to him." Ex. 30, p. 22. The Court finds that Beverly Poston wanted her funds placed in treasury bills (Ex. 30, p. 24) but that does not require a finding that Mark Benskin was an agent of American Capital. In fact, he was not and had no representative capacity to act for American Capital. Mark Benskin was, however, acting in a fiduciary capacity as to Beverly Poston when he persuaded her to place her funds with him for investment. But the proof does not persuade the Court that an express trust was created.

Thus, the next inquiry is whether a constructive trust existed between Beverly Poston and the debtor and whether it was

6. The Maples withdrew a total of approximately $85,000.00 and invested at most $24,000.00 over their investment history with the debtor from 1984 to 1989.

7. *See* 28 U.S.C. § 1961; *DuVoisin v. Anderson, et al. (In re Southern Industrial Banking Corp.),* 87 B.R. 518, 523 (Bankr.E.D.Tenn.1988).

perpetuated until the bankruptcy filing. In addition to the general trust requirements of a trustee, a beneficiary, and identifiable trust property, a constructive trust requires proof of: "(1) a wrongful act; (2) specific property acquired by the wrongdoer which is traceable to the wrongful behavior; and (3) an equitable reason why the party holding the property should not be allowed to keep it." *Merrill v. Abbott, et al. (In re Independent Clearing House Co., et al.)*, 41 B.R. 985, 1000 (Bankr. D.Utah 1984) (citations omitted), *aff'd. in part, rev'd. in part*, 62 B.R. 118 (D.Utah 1986). *See also Emerson v. Marty*, 135 B.R. at 833 (*citing Kopsombut–Myint Buddhist Center v. State Board of Equalization*, 728 S.W.2d at 333). This latter requirement is ordinarily met when it can be shown that the party holding such property is not a good faith, bona fide purchaser for value. *See, e.g., CH Robinson Co. v. Trust Co. Bank, N.A.*, 952 F.2d 1311 (11th Cir.1992), *reh'g denied*, 961 F.2d 224 (11th Cir.1992); *Garland v. Higgins*, 160 Tenn. 381, 25 S.W.2d 583 (Tenn.1930). Where such a party qualifies as a good faith purchaser for value, the rights of an express or constructive trust beneficiary are defeated. *Garland v. Higgins*, 25 S.W.2d at 585.

The Court easily can find that the debtor was not a good faith, bona fide purchaser of Mrs. Poston's funds, as it has been established that it obtained them by fraud. However, the major impediment to a conclusion that either an express or constructive trust existed as to the Poston funds is that the funds were not segregated and that they were not perpetuated as a trust property by the debtor until the bankruptcy filing.

The intervenor's case rests in large part upon the success of tracing Beverly Poston's deposit on November 17, 1988, to the payment to the Maples. The intervenor established that in the fall of 1988, the National Bank of Commerce internally used methodology of first posting credits, such as deposits, then posting debits, such as bank charges and then posting debits for checks, with the smallest check on a given clearing day posted first. However, this internal bank policy of first in, first out posting does not establish what occurs when a bankruptcy petition is filed after the account reaches a zero balance or a balance lower than the deposit in question. *See, e.g., First Federal of Michigan v. Barrow*, 878 F.2d 912, 916 (6th Cir.1989) (for discussion of "lowest intermediate balance test"). The posting procedure was for internal bank purposes only, and Mr. James L. Lindsey, Vice President of the Bank, testified that the Bank did not monitor an "escrow" account to assure that it was used properly. Mr. Lindsey also agreed that intermingled funds generally lost their identity.

Mr. Exelbierd testified that in 1988, the aggregate amount of $1,999,902.39 was deposited into the escrow account and $1,914,-775.73 was disbursed from that account. At the end of 1988 the debtor had total cash and assets of $425,588.67 but investor liability on a cash basis of $732,000.00. The debtor's fabricated statements to customers showed a liability to customers of $5.2 million. The Court does have proof in this proceeding, through the cross examination testimony of the intervenor's expert certified public accountant, Jerry Whitehorn, that the escrow account reached zero subsequent to the Poston deposit and prior to the bankruptcy filing.[8] Moreover, it is clear from an analysis of the bank account that Beverly Poston's deposit was subsequently reduced and depleted. *See* Exs. 4, 5, 15, 28 & 29. That is, the debtor used the bank credit resulting from the Poston deposit to pay numerous checks written on the account, and the bank debited the account for those checks. The Poston estate offered clear and extremely well prepared proof to show the internal tracing of the debits from the Poston deposit. *See, e.g.,* Exs. 28 & 29. By following the bank's internal posting methodology four checks to the Maples totalling $33,100.00 can be traced back to the Poston deposit. Exs. 28 & 29.

However, the Court is not persuaded that the bank's internal posting methodology and

---

8. The Court has not considered as proof in this proceeding its finding number 23 in *Emerson v. Marty*, 135 B.R. at 829, that by "April, 1989, [o]nly a nominal amount remained in the debt-or's escrow account." However, there is an admission by the Trustee in this adversary proceeding that no funds remained in the debtor's escrow account.

its resulting tracing is dispositive for purposes of this proceeding. As indicated at the beginning of this opinion, a resolution is required of the confrontation between the bankruptcy policy favoring avoidance recovery for the benefit of all unsecured creditors and Tennessee equitable or legal concepts favoring a single defrauded creditor. Absent bankruptcy creditor considerations, the Poston estate, under Tennessee law, would prevail on an equitable theory against the Maples, as the Poston estate has followed the bank's debits against her deposit into the Maples' hands. However, the proof in this proceeding has not established that any conspiracy existed between the Maples and the debtor to defraud Beverly Poston. As a result, the Poston's tracing into and recovery from the Maples would depend under state law on a creditor's action to avoid the fraudulent conveyances to the Maples. Tenn.Code Annot. § 29–12–101, *et seq.*

■ Upon the filing of a bankruptcy, avoidance powers are "explicitly give[n] only to the trustee." Epstein, Nickles & White, BANKRUPTCY § 6.2 at 499 (1992); 11 U.S.C. §§ 544, 545, 547, 548, 549, 553. The Congressional policy is clear: Upon the filing of a bankruptcy the avoidance powers are intended to benefit all creditors of the bankruptcy estate. Epstein, Nickles & White, BANKRUPTCY, § 6.2 at 499. To allow individual creditors, such as Beverly Poston, to pursue avoidance actions would create a "conflict with and between creditor classes." *First Federal of Michigan v. Barrow*, 878 F.2d at 915. This Court must consider the interests of all other creditors who are similarly situated to Beverly Poston. Counsel for Beverly Poston represented the intervenor in the *Marty* proceeding referred to previously and represents other intervenors, and it is clear that there were many other creditors who were defrauded by these debtors. There are insufficient bankruptcy estate assets to satisfy all creditors, and to permit recovery by the Poston estate from the Maples would reduce the recovery by the bankruptcy Trustee, with a resulting reduction in pro rata payment to other defrauded creditors. A balancing of the equities and the Congressional policy behind the Bankruptcy Code favors recovery by the bank-

ruptcy Trustee and allowance of Beverly Poston's unsecured claim for pro rata distribution along with other defrauded holders of unsecured claims.

The Court is persuaded that the tracing demonstrated by the Poston proof is not determinative in this proceeding because Mrs. Poston's deposit into the debtor's escrow account was depleted before the bankruptcy case was filed. The debtor exercised total control over the disposition of the escrow account, resulting in the depletion of trust property, assuming that a trust was created when Mrs. Poston surrendered her funds to the debtor.

■ Fundamental to the Court's ultimate conclusion is an examination of the nature and extent of the debtor's prepetition interest in the funds. Section 541(a) of the Bankruptcy Code designates any legal or equitable interests of the debtor in property at commencement of the bankruptcy case "property of the estate" and that includes any interests recovered pursuant to applicable avoidance sections of the Code. 11 U.S.C. § 541(a)(1) and (3). This is an "admittedly broad definition of includable property;" however, the nature and extent of the debtor's interests referenced by § 541(a) are influenced by state law applied in a manner consistent with federal bankruptcy law. *Patterson v. Shumate*, —— U.S. ——, ——, 112 S.Ct. 2242, 2249, 119 L.Ed.2d 519 (1992); *Torres v. Eastlick, et al. (In re North American Coin & Currency, Ltd.)*, 767 F.2d 1573 (9th Cir.1985), *am'd.* 774 F.2d 1390 (9th Cir. 1985), *cert. denied*, 475 U.S. 1083, 106 S.Ct. 1462, 89 L.Ed.2d 719 (1986); *Sanyo Electric, Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.)*, 874 F.2d 88, 93 (2nd Cir.1989); *White v. White (In re White)*, 851 F.2d 170, 173 (6th Cir.1988). The filing of the bankruptcy petition does not expand the debtor's property interests. The estate succeeds to property only to the extent of the right and title possessed by the prepetition debtor. *United States v. Whiting Pools*, 462 U.S. 198, 204, n. 8, 103 S.Ct. 2309, 2313 n. 8, 76 L.Ed.2d 515 (1983). This rule is significant here because, as mentioned above, it is generally held, pursuant to 11 U.S.C.

§ 541(d), where a debtor holds property in trust for another that the debtor's only interest is mere legal title.[9] *Id.* Moreover, in the bankruptcy context, the claim of the equitable interest holder or beneficiary to perpetuated trust assets is considered superior to that of the bankruptcy trustee notwithstanding the trustee's judgment lien creditor status or avoidance powers. *See, e.g., Vineyard v. McKenzie (In re Quality Holstein Leasing),* 752 F.2d 1009, 1012 (5th Cir.1985); *In re Howard's Appliance Corp.,* 874 F.2d at 93, *cf. National Bank of Alaska v. Erickson (In re Seaway Express Corp.),* 912 F.2d 1125, 1128 (9th Cir.1990) (The "majority rule is that § 541(d) does not limit the trustee's powers over real property under § 544(a)(3)."). Indeed, the United States Supreme Court has noted that under Bankruptcy Code § 541(d), the bankruptcy estate "plainly" does not include "property of others held by the debtor in trust at the time of the filing of the petition." *United States v. Whiting Pools,* 462 U.S. at 205, n. 10, 103 S.Ct. at 2314, n. 10; *see also Begier v. I.R.S.,* 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). It must be noted that this debtor no longer held Mrs. Poston's property in perpetuated trust when the bankruptcy was filed.

▇▇ Under both state law and federal bankruptcy law, the equitable interest in property acquired by fraud may remain property of its rightful owner only to the extent that it is identifiable. *See, e.g., Quality Holstein Leasing,* 752 F.2d at 1012; *McAllester v. Aldridge (In re Anderson),* 30 B.R. 995 (M.D. Tenn.1983); *Covert v. Nashville, C & St. L. Ry.,* 186 Tenn. 142, 208 S.W.2d 1008, 1 A.L.R.2d 154 (1948). Accordingly, the fraudulent acquirer obtains mere title or a possessory interest and is said to hold identifiable property in trust for its beneficiary or rightful owner. Such a trust is "constructed" by a court of equity "to satisfy the demands of justice" and prevent unjust enrichment. *In re Anderson,* 30 B.R. at 1014. Thus, it is referred to as a "constructive trust." *Id.* The § 541(d) exclusion from property of the estate applies with

equal force to constructive and express trusts. *See, e.g., In re Howard's Appliance,* 874 F.2d at 93.

Thus, the inquiry moves more specifically to why Beverly Poston's state law recovery of her traced funds failed to survive the bankruptcy filing.

▇▇ Clearly, the Maples do not qualify as good faith purchasers for value of the fraudulent conveyances to them. That finding is essential to the Trustee's § 550 recovery from them. Although they may have received the transfers in good faith, they did not give value. A basic premise of avoidance law is that the transfer as avoided "is preserved for the benefit of the [bankruptcy] estate but only with respect to property of the estate." 11 U.S.C. § 551. How then does avoidance and recovery from the Maples place the bankruptcy Trustee in a superior position to Mrs. Poston's estate? The first step, as previously stated, is acknowledgement that any trust fund was depleted by the debtor prior to the bankruptcy filing. As to the Poston funds, the only asset remaining in the debtor's estate at the bankruptcy filing was an avoidance action of the federal bankruptcy estate against the transferees. A trustee, under § 544, has,

> [a]s of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>
> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
>
> (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time

---

**9.** Section 541(d) provides in pertinent part: "Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."

and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(§ (a)(3) omitted)

These broad powers, in addition to the specific authority of § 548, give the Trustee a status that is superior to Beverly Poston's position. A creditor, for example, is deprived of its authority to pursue state law avoidance actions, because § 544(b) vests that authority in the bankruptcy trustee. *American National Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1275 (5th Cir.1983). As the Poston deposit had been depleted so that its tracing must go outside the escrow account, the Poston claims are against the same transfers that the Trustee is avoiding. Upon avoidance, the Trustee's interest primes Beverly Poston's interest. Otherwise, as stated, the bankruptcy policy of equality of distribution for similarly located creditors and the concepts supporting §§ 544, 548, 550 and 551 would be defeated for the benefit of only one creditor.

It is not a simple task to justify the result of the bankruptcy estate defeating what appears to be a constructive trust. In fact, if a perpetuated trust res did exist in Beverly Poston's favor, the justification could not be made, as the trust property would never have become property of the bankruptcy estate. *See* 11 U.S.C. §§ 541(d) and 551. The depletion of Beverly Poston's funds is the factor upon which the result rests, as her trust res disappeared and was converted into an avoidance cause of action held solely by the bankruptcy estate.

■■■■■ Turning more specifically to the analysis of a constructive trust in this proceeding, it is well settled that the burden of proving facts which warrant the imposition of a constructive trust and thus, application of § 541(d), is on the claimant. *See, e.g., First Federal of Michigan v. Barrow*, 878 F.2d at 915. If it can be demonstrated that the subject property was acquired by fraud, the claimant must then demonstrate that it can be traced. *Id.* at 915–916. In the bankruptcy context, sufficient tracing and identification of the trust property is essential to the establishment of a constructive trust when the funds have been commingled with other funds. According to the Sixth Circuit Court of Appeals,

> ... the predicate for the trust doctrine as applied in bankruptcy is a *perpetuated integrity of the trust properties* so as to avoid conflict with and between creditor classes; ... If the trust fund or property cannot be identified in its original or substituted form, the cestui que trust becomes merely a general creditor of the estate.

*First Federal of Michigan v. Barrow*, 878 F.2d at 915 (emphasis added) (*quoting in part* 4 L. King, COLLIER ON BANKRUPTCY, paragraph 541.13 at 541–78—541–79 (15th Ed.1988)). Therein lies the failure for the Poston estate's proof on a constructive trust: The deposit was depleted; thus, there was not a perpetuated integrity of the alleged trust deposit. The Poston estate argues that they have traced into the Maples' accounts; however, this is not tracing into assets acquired by the debtor so as to enable a trust beneficiary to recover those assets in superiority to the bankruptcy estate's recovery. *See, e.g., Republic Supply Co. of California v. Richfield Oil Co.*, 79 F.2d 375, 377 (9th Cir.1935). "Due to the commingling and fraud in the [Benskin escrow] account, no investor can trace his [or her] investment to any specific asset of the estate." *Hatoff v. Lemons and Associates, Inc.*, 67 B.R. 198, 213 (Bankr.D.Nev.1986). The Court makes this finding, notwithstanding the tracing proof produced in this proceeding, because to allow the Poston estate to trace beyond the depleted escrow funds and to compete with the Trustee would be to elevate the Poston claims above an avoidance recovery for all creditors and to allow her estate a better recovery than similarly defrauded creditors.

Another impediment to the alleged constructive trust prevailing over the Trustee's

avoiding powers is that there is a factual dispute as to whether any restriction was placed on the funds by Beverly Poston. In a deposition, Beverly Poston testified that she told Mark Benskin that she wanted her "money to go into treasury bills." Ex. 30, p. 24. She further testified that Mr. Benskin agreed that he "would put it all in American Capital for the T–Bill." *Id.*, p. 25. In an offer of proof, Marnie Fernandez, the daughter of Beverly Poston, confirmed her mother's instructions. Mr. Benskin denied that such a conversation occurred. The Court does not need to decide which version of the conversation is correct, as the Court is convinced that, as between Mr. Benskin and Mrs. Poston, Mr. Benskin accepted Mrs. Poston's money with a fiduciary obligation to invest it for her. The fact is, however, he did not do that and he exercised control over the funds, commingling and then depleting them. Thereafter, the bankruptcy estate was created and Mrs. Poston became a creditor competing with other similarly defrauded creditors in the bankruptcy estate.

In summary, when the loss of the integrity of the funds is coupled with the position that Mrs. Poston bears in relationship to the other unsecured creditors, in the balance the Trustee prevails over Mrs. Poston, who will hold an unsecured claim in the bankruptcy estate. This analysis is consistent with analyses by two recent appellate courts.

The Court of Appeals for the Eleventh Circuit recently has considered a Ponzi-type scheme in *Securities and Exchange Commission v. Elliott, et al.,* 953 F.2d 1560 (11th Cir.1992), *rev'd in part,* 998 F.2d 922 (11th Cir.1993), where the defendant "devised several programs as vehicles for the victims to 'invest' in his companies." *Id.* at 1565. In a case involving a nonbankruptcy receiver, that Court reviewed tracing concepts and in rejecting tracing for one "victim," concluded that "it would not be equitable to give some [former defrauded security holders, who occupied the same legal position as all such creditors,] preferential treatment in equity." *Id.* at 1570 (citing *Commodity Futures Trading Commission v. Franklin,* 652 F.Supp. 163 (W.D. Va.1986), *rev'd. Anderson v. Stephens,* 875 F.2d 76 (4th Cir.1989)). Howev-

er, the same Court, in discussing the setoff claims of another creditor who was permitted to use the debtor's fraud as a defense to the receiver's claim, recognized that the facts usually drive the result.

> A claimant is not treated better in the eyes of the law if the controlling facts surrounding his or her case lead to a different legal conclusion. To argue that all claimants should be treated similarly, without presenting facts, is an empty argument. One of the basic purposes of law and the courts is to determine which facts are legally relevant or irrelevant. If relevant facts differ, then the law will treat the claimants differently. Thus, it is incorrect to say the law prefers one claimant if that claimant's situation differs in a legally cognizable way. The court must examine [each creditor's] case individually to determine what type of treatment the law should accord him.

*Id.* at 1573 (citations omitted).

A significant distinction made by the *Elliott* Court, after its examination of all of the proof, was that some

> claimants were not permitted to trace into the receivership because they were all defrauded in the same way, and the remaining funds were insufficient to cover their claims. The other claimants were not permitted to use fraud as a sword to trace assets when the assets were dissipated, while [the setoff claimant] is using fraud as a shield [to the receiver's suit against that setoff claimant].

*Id.* at 1574.

As instructed by the *Elliott* decision, this Court has examined and weighed all relevant facts in reaching its decision. There is a difference in this case between the Trustee recovering and/or retaining property of the estate, albeit originally fraudulently obtained by the debtor, and the Trustee using the debtor's fraud as a basis to sue a creditor who was defrauded by the debtor. The Maples were not the victims of the debtor's fraud; rather, they profited from the debtor's fraud. There is no equitable defense available to prevent the Trustee's recovery from them. In contrast, Beverly Poston was defrauded by the debtor and lost her invest-

ment as a result. However, Beverly Poston unfortunately is in the same position as numerous other defrauded investors. Counsel for Beverly Poston argued that *Elliott* was factually distinguished on the basis that its victims willingly loaned stock to the debtor; nevertheless, the victims were defrauded. Beverly Poston willingly turned her money over to this debtor and she was defrauded. The attempted distinction does not persuade the Court.

In *McLemore v. Third National Bank in Nashville (In re Montgomery)*, 983 F.2d 1389 (6th Cir.1993), the Court concluded that the debtor's massive check kiting scheme involved transfers of the debtor's interest in property that depleted the debtor's estate. Notwithstanding the illegal nature of the kiting, that debtor acquired an interest in the account balance created by kiting. A critical factor was that the funds were not segregated or held in "constructive trust for the victimized institutions." *Id.* at 1393. In contrast to the Benskin case there was no contention in *Montgomery* that a trust arose. The *Montgomery* Court concluded that the debtor's control over the nonearmarked proceeds of the kiting was crucial to the analysis. *Id.* at 1395. In this proceeding, the Poston estate has not relied on an earmarking theory. The facts would not support such a theory, as the Poston funds were depleted before the bankruptcy filing and they were not used for investment on behalf of Beverly Poston.

In its analysis, the *Montgomery* Court stated that "[p]reservation of the separate identity of the funds would have been of critical importance" in · a case involving a victim's attempted recovery of converted, embezzled or otherwise fraudulently obtained funds. *Id.* at 1393. This conclusion is consistent with this Court's conclusion in this proceeding.

### CONCLUSION

The Trustee has established that the transfers to the Maples are avoidable under 11 U.S.C. § 548, and a separate order and judgment will be entered in favor of the Trustee against Ray and Brenda Maples, jointly and severally, for $53,100.00 plus pre-judgment interest at the federal rate from the date of filing of the Trustee's complaint.

The avoidance action and complaint by Beverly Poston against the Maples will be denied, and the recovery by the Beverly Poston estate against the bankruptcy estate will be denied, except that Beverly Poston is allowed an unsecured claim in this bankruptcy estate, with the amount of the claim to be determined in a separate hearing if necessary. *See* F.R.B.P. 3002(c)(3). As between the causes of action asserted by the Trustee and Beverly Poston, the Trustee's avoidance powers defeat the sole creditor's avoidance powers.

The Court will enter a separate order and judgment.