**In re John Waldrup BROWN, Jr., Debtor.**

**George W. EMERSON, Jr., Plaintiff,**

v.

**FEDERAL SAVINGS BANK, Defendant.**

**George W. EMERSON, Jr., Plaintiff,**

v.

**UNION PLANTERS NATIONAL BANK, Defendant.**

**Bankruptcy No. 93–25007WHB. Adversary Nos. 95–0518, 95–0519.**

United States Bankruptcy Court, W.D. Tennessee.

June 13, 1997.

Toni Campbell Parker, Apperson, Crump, Duzane & Maxwell, P.L.C., Memphis, TN, for George W. Emerson, Jr., Chapter 7 Trustee.

Ross Higman, J. Richard Buchignani, Wyatt, Tarrant & Combs, Memphis, TN, for Union Planters National Bank.

Robert F. Miller, Thomas J. Walsh, Jr., Wolff Ardis, P.C., Memphis, TN, for Federal Savings Bank.

MEMORANDUM OPINION GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

WILLIAM HOUSTON BROWN,
Bankruptcy Judge.

The plaintiff in these adversary proceedings is the chapter 7 trustee who sued the two defendant banks for avoidance of alleged preferential transfers. The defendant banks filed motions for summary judgment, and the trustee responded with his motions for partial summary judgment. In their pleadings and in their statements at oral argument of the counter motions, counsel for the parties agreed that there are no disputes of fact on the § 547(b) issues,[1] and the court finds that there are no disputes of material fact on the issues necessary for ruling upon the summary judgment motions. This memorandum opinion contains conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. By separate orders, the court will grant the defendants' motions for summary judgment and deny the trustee's motions.

These proceedings involve an admitted check kiting scheme by the debtor, who was writing checks between accounts at the two defendant banks, and for purposes of the motions before the court there is no dispute that the check kiting occurred within the ninety day preference period.[2] Check kiting may be defined as

a systematic pattern of depositing nonsufficient funds (NSF) checks between two or more banks, resulting in the books and records of those banks showing inflated balances that permit these NSF checks to be honored rather than returned unpaid. In addition other checks and withdrawals may be honored against these inflated balances, resulting in actual negative balances, to the extent that banks allow withdrawal of uncollected funds. Put simply, check kiting is accomplished by taking advantage of the float—that is, the time required for a check deposited in one bank to be physically presented for payment at the bank on which it was drawn.

Johnny S. Turner and W. Steve Albright, "Check Kiting Detection, Prosecution, and

1. In an inconsistent pleading, the trustee asked for summary judgment on the § 547(b) issues but denied the nonexistence of a dispute as to "whether any antecedent debt was paid off with earmarked funds." Trustee's Motion at p. 2. Then, the trustee offered no proof to show that the loan from the debtor's uncle, which will be discussed later in this opinion, was not earmarked. In the presence of proof presented by the defendants that the loan proceeds were earmarked, the trustee can not rely upon his assertions in the pleadings to overcome the defendants' summary judgment motions on that issue. FED.R.CIV.P. 56(e).

2. The defendants' proof included affidavits, which stated that the kite did not begin on February 10, 1993, the first day of the preference period; however, for simplicity sake the banks included all of the debtor's checking activity during the entire ninety day preference period in their calculations of the maximum possible preferences. See Affidavits of Bobby R. McDonald and Nancy Bradley.

Prevention," FBI LAW ENFORCEMENT BULLE-TIN 12, 13 (November 1993); *see also* similar definitions in *McLemore v. Third National Bank in Nashville (In re Montgomery)*, 123 B.R. 801, 807 (Bankr.M.D.Tenn.1991).

## SECTION 547(b) ISSUES RAISED IN PROCEEDINGS

These summary judgment motions present the following critical issues: 1) whether the two defendant banks were creditors with antecedent debts for purposes of § 547(b)(2); 2) whether the banks were fully secured creditors on any antecedent debts owed to the banks, and thus; 3) whether the banks received more than they would have received in a chapter 7 liquidation under § 547(b)(5); and 4) whether some of the transfers to the banks were protected by the earmarking doctrine so as to prevent those protected transfers from being "an interest of the debtor in property" under § 547(b). In addition to these material issues, the trustee raises a legal issue about the appropriate method for calculating the amount of the alleged preferential transfers to the defendant banks; however, as a result of the court's conclusion that these banks were fully secured creditors as to any transfers to them, it will be unnecessary for the court to fully decide this calculation issue.

## HISTORY OF CASE AND PROCEEDINGS

The debtor filed a voluntary petition for chapter 7 bankruptcy relief on May 11, 1993. The chapter 7 trustee filed these two adversary proceedings on May 12, 1995. The parties have engaged in extensive discovery before filing their motions for summary judgment. The banks seek summary judgment that there were no antecedent debts to the banks, that they were fully secured creditors on any transfers from the debtor during the preference period, and that the majority of any transfers were protected from preference avoidance by the earmarking doctrine. The trustee's motions seek partial judgment also on the § 547(b) issues, leaving for another day the § 547(c) exception issues that were raised in the banks' answers. It will be unnecessary to address those § 547(c) issues, as the court will grant the banks' § 547(b) motions that the banks were secured creditors and that a majority of the transfers were from earmarked funds. The court's opinion assumes the existence of antecedent debts.

## UNDISPUTED FACTS

During the ninety days before the commencement of this case, the debtor maintained checking accounts at the two banks, account number 4141229 at Union Planters Bank ("UP") and account numbers 06-81029066 and 06-81057566 at Federal Savings Bank ("FSB"). Within the ninety days prior to bankruptcy the debtor deposited numerous checks into the three accounts and wrote numerous checks that were drawn on all of the accounts. The trustee's affidavit filed on May 6, 1997 attaches an exhibit to the debtor's October 14, 1996 deposition, which contains copies of the bank statements with all checks written by the debtor on the three accounts during the preference period. No one counted them for the court, and I have not done so; however, it is obvious that the debtor wrote a large number of checks during this period. Many of the checks that were written were payable to numerous creditors who are not defendants to any avoidance action by the trustee.

The debtor was employed at UP from 1969 to 1979, and again from 1984 to 1991 as a Vice President, when he went to work as Executive Vice President at FSB, where he worked until 1993. Despite this employment at the two defendant banks, there is no issue of insider status, and the trustee is only looking to avoidance of transfers within the ninety day period prior to the bankruptcy filing. The debtor admitted that he was kiting checks in 1993 between the two banks and the three accounts. The kiting began in February 1993 and ended on April 28, 1993. The two banks were innocent and without knowledge of the kiting until late in April 1993, when an officer of FSB told the debtor that a deposit made by him to an FSB account was drawn against uncollected funds at UP and that the deposit had been "pulled out." Deposition of debtor, p. 25. An assistant branch manager at FSB had become suspicious on April 26, when she was called by a UP representative to verify checks drawn on the FSB accounts and deposited in

the UP account. Prior to this collapse of the kite, the banks had followed their routine practice of granting the debtor, like other customers, immediate provisional credit upon Mr. Brown's deposits. On April 28 the debtor went to his uncle, L. Palmer Brown III, and told him that he had checks "that were out that were going to be coming into the bank that I needed to cover. I asked him for a loan. He agreed to loan me the money, and I deposited it that same day." *Id.*, at p. 24. Palmer Brown's check was drawn on his own FSB account, and the debtor split his uncle's loan of $60,000 between his two accounts at FSB, resulting in checks drawn on both FSB and UP clearing and leaving a small positive collected funds balance in all three accounts. The debtor stated that the "float" between the two banks' accounts on that day and prior to the $60,000 deposit was approximately $54,000. *Id.*, at p. 26. The debtor stated that he always "knew that ultimately I would have to go to my uncle and ask him to loan me the money," and that he knew that his uncle would do so; thus, the debtor never thought in terms of either bank taking a loss for his kiting activity. *Id.*, at pp. 27–8. It is clear from both the debtor's and his uncle's testimony that the uncle's loan was "designated for a specific purpose" and that was to "pay both banks." *Id.*, at p. 29; *see also* Affidavit of L. Palmer Brown, III. The debtor testified that he had no discretion to use his uncle's loan in any other way. L. Palmer Brown is scheduled in the debtor's bankruptcy as an unsecured creditor for $65,000.

### DISPUTED MAXIMUM POSSIBLE PREFERENCE

The trustee has sued to avoid and recover from FSB the total of all checks drawn on the UP account and deposited in FSB account number 06–81029066, $251,250, and all checks drawn on the UP account and deposited in FSB account number 06–81057566, $45,650, for a total recovery from FSB in the amount of $296,900. The trustee has sued to avoid and recover from UP the total of all checks drawn on the FSB accounts and deposited in the UP account number 4141229, for a total recovery from UP of $253,875. As to both banks, the trustee seeks prejudgment interest. The banks dispute that the trust-

ee's calculation of the maximum avoidable recovery is correct. Although it is not necessary for the court to resolve that dispute, as it is not a factual dispute that is material to the outcome of these proceedings, the court will discuss the legal dispute over the appropriate method for calculation in the context of the banks' proof that no preference occurred. All § 547(b) disputes between the plaintiff and defendants are disagreements over the applicable or controlling law.

### SUMMARY JUDGMENT

Federal Rule of Bankruptcy Procedure 7056 adopts Federal Rule of Civil Procedure 56, in which Rule 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In these proceedings, there are depositions, interrogatories, affidavits, and exhibits to these documents, all of which have been considered by the court in its conclusion that there are no genuine issues of material fact in dispute and that summary judgment is appropriate. Where the defendants have shown no genuine issue of material fact and where the trustee so agrees in his motion as to the § 547(b) elements, summary judgment is appropriate. Moreover, as pointed out in footnote 1 of this opinion, when the defendants present proof to support their motions, the trustee may not "rest upon the mere allegations or denials" of his pleadings to overcome the defendants' motions. FED. R.CIV. P. 56(e).

### DISCUSSION AND CONCLUSIONS OF LAW

Of course, the basic elements of a preference must be established in order for the trustee to avoid the transfers at issue. Avoidance is necessary before the trustee may recover under § 550(a). Section 547(b) provides that an avoidable preference is a

transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor,

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent,

(4) made [for purposes of these proceedings]

    (A) on or within 90 days before the date of the filing of the petition; and

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The trustee has the burden of proof on each of these elements. 11 U.S.C. § 547(g). The statutory elements in controversy here are whether there were transfers to the banks in satisfaction of antecedent debts and whether those transfers enabled the banks to receive more than allowable under the § 547(b)(5) analysis. The initial premise of § 547(b) is also at issue: Were the transfers to the banks from the $60,000 loan proceeds transfers of an interest of the debtor in property?

EARMARKING

■ The court will conclude that none of the transfers to these banks were preferences because of their secured positions; however, as an alternative to that conclusion, the banks contend that most of any transfers were protected by an earmarked loan. The court will address that alternative argument to illustrate that, under any of the trustee's theories, avoidance is minimized if not totally barred. There may be disagreement in some avoidance proceedings as to whether the trustee has the burden of proving the nonapplicability of earmarking or whether the defendant has the affirmative duty to prove all of the elements of earmarking. In *Tolz v. Barnett Bank of South Florida, NA. (In re Safe–T–Brake of South Florida, Inc.)*, 162 B.R. 359 (Bankr.S.D.Fla.1993), Judge Gins-

berg discussed persuasively his conclusion that the trustee should have the burden to prove that earmarking does not apply. "The plain meaning of section 547 necessarily leads to the conclusion that proof of the nonapplicability of the earmarking doctrine is an element the trustee must prove in order to establish that the transaction in question was indeed an avoidable preference." *Id.*, at 364. If the transfer was not one of the debtor's property or of an interest of the debtor in property, the transfer can not be an avoidable preference. Earmarking, according to this analysis, "is a shorthand way of denying that what was transferred was an interest of the debtor in property." *Id.*, at 365 (citing *In re Interior Wood Products Co.*, 986 F.2d 228, 231 (8th Cir.1993)). The mere fact that the defendant pleads the existence of earmarking as a denial of the existence of a preferential transfer "does not shift the burden of proof." *In re Safe–T–Brake*, 162 B.R. at 365. Earmarking is not a § 547(c) defense as to which the defendant bears the burden. *Id.*; 11 U.S.C. § 547(g).

■ While this court concludes that Judge Ginsberg's analysis is persuasive, placing the burden of proof on the trustee would have no different effect on the outcome of these proceedings because the defendants produced convincing proof that earmarking did exist in reference the uncle's $60,000 loan, while the trustee offered no proof to rebut the existence of earmarking. The defendants carried the burden of proof whether they were required to or not. As Judge Ginsberg noted, "[a]pplication of the earmarking doctrine is inherently fact based." *Id.*, at 363. There is not, however, any dispute of the facts in this case as they relate to earmarking.

It is interesting that the trustee relies heavily upon authority from this Circuit, *McLemore v. Third National Bank in Nashville (In re Montgomery)*, 983 F.2d 1389 (6th Cir.1993), as the controlling law in this case, yet ignores the authority in that opinion on earmarking. For reasons that will be discussed later in this opinion, this court does not find *Montgomery* to be controlling nor particularly instructive on the issue of the secured status of these defendant banks; however, *Montgomery*; does provide guid-

ance on earmarking, albeit in dicta. Earmarking was not an issue in *Montgomery;* nevertheless, that court observed that earmarking "is an important exception to the general rule that the use of borrowed funds to discharge the debt constitutes a transfer of property of the debtor: where the borrowed funds have been specifically earmarked by the lender for payment to a designated creditor, there is held to be no transfer of property of the debtor even if the funds pass through the debtor's hands in getting to the selected creditor." *In re Montgomery,* 983 F.2d at 1395 (citing *In re Hartley,* 825 F.2d 1067, 1070 (6th Cir.1987); *In re Smith,* 966 F.2d 1527, 1533 (7th Cir.1992); *In re Bohlen Enterprises, Ltd.,* 859 F.2d 561, 564–66 (8th Cir.1988)). Going further in its reliance upon *Bohlen* as an expression of the law on earmarking, the *Montgomery* Court noted: "The courts have said that even when the [lender's] new [earmarked] funds are placed in the debtor's possession before payment to the old creditor, they are not within the debtor's 'control.'" 983 F.2d at 1395 (quoting *In re Bohlen,* 859 F.2d at 565); *see also In re Hartley,* 825 F.2d at 1070.

Despite this endorsement of the law on earmarking, the trustee's argument against the applicability of earmarking in this case was that the loan proceeds to the debtor from his uncle were received and deposited in the debtor's checking account at FSB, and that the debtor could have exerted control over those funds after the check was written to him or deposited. That argument ignores the only factual evidence, which proves that both the debtor and his uncle agreed that the loan would be used to eliminate the overdrafts in the debtor's checking accounts. One may logically ask: How could the debtor comply with this agreement for the use of the loan without depositing the loan into his checking accounts? As to the trustee's argument that the debtor might have done something else with the loan, this goes to the contention that the debtor had discretion over the use of those funds. Again, this position is not supported by any proof, rather, the debtor's testimony was that he did not have discretion to do otherwise with the loan. Moreover, there is absolutely no indication that the debtor thought of doing anything other than complying with the agreement to deposit the loan check. The trustee's argument fails to suggest how the debtor could have exercised any control after depositing the loan into his accounts at FSB. At that point, both banks were aware of the prior kiting, and the debtor had been called to task to remedy the overdrafts. As the debtor testified, on the day of the loan deposit, the debtor had checks outstanding on his FSB accounts that had been deposited in his UP account, and he had checks outstanding on his UP account that had been deposited in the FSB accounts. Without his uncle's loan to cover those outstanding checks, there were overdrafts in both the FSB and UP accounts. He deposited the loan check on the same day of its receipt, and it defies reason to suggest that FSB would have allowed the debtor to then write checks to new creditors or to withdraw the funds when a known overdraft would result. The uncle's loan check was deposited in a split deposit into the two accounts at FSB, and the deposits were used to clear the overdrafts at FSB. which in turn resulted in elimination of the overdraft at UP. The affidavit evidence shows that $49,745.73 of the loan proceeds deposits went from the FSB accounts to pay checks written on those accounts and deposited in the UP account. The deposit of the $60,000 resulted in positive collected funds balances in all three accounts.

Based upon the only evidence before the court, it is clear that the parties to the loan transaction treated the $60,000 loan as earmarked for the specific purpose of paying the overdrafts incurred by the debtor as a result of his check kiting at both FSB and UP. The debtor complied with his commitment to his uncle to so use the funds, and they were in fact so deposited and so used. There is no proof to suggest that the debtor had a thought or opportunity to exercise control over those funds other than to deposit them as he did. There is no proof to suggest that the debtor could have exercised any discretion to withdraw the funds after their deposit, and it is improbable to believe that FSB would have allowed anything to be done with the $60,000 other than use it for overdraft coverage. Based upon the undisputed and only evidence, the court can only conclude that the law on earmarking, as endorsed by

the Court of Appeals for this Circuit, is applicable in these proceedings. The $60,000 loan proceeds were not property of the debtor, and to the extent of application of that deposit to the overdrafts at FSB and UP, preferential transfers to these banks could not have occurred.

## NON–EARMARKED TRANSFERS

■ The question then becomes whether there were other transfers to the banks that are not protected by the earmarked loan. In that regard, the parties are in disagreement, which normally would present an issue of fact that would prevent summary judgment. The disagreement is not, however, factual; rather, it is a dispute over how the law should treat the facts. The trustee contends that the total preference is calculated by adding each check written by the debtor on these accounts during the ninety day period if those checks were a part of the kiting scheme. The trustee concedes that the *Montgomery* Courts approved use of the "greatest extent of the kite" or "greatest insecurity" standard in those cases, but argues that *Montgomery* does not restrict courts to that standard in all cases. Trustee's Memorandum, p. 7; *In re Montgomery*, 123 B.R. at 817. The banks, on the other hand, argue that reason dictates that the maximum preferences would be the total amount of overdrafts in the absence of the kite, an approach that would determine the extent of the debtor's benefit from his kiting scheme.

As an exhibit in support of UP's motion for summary judgment, this court has certain trial exhibits in the *Montgomery* case including testimony of Laroy Wolff's, that trustee's expert. That *Montgomery* expert's method for calculating Third National Bank's ("Third National") "point of greatest insecurity" was to first determine the debtor's net account balances according to bank statements on a given day, which were typically negative amounts reflecting overdrafts. Next, the canceled checks for the accounts were reviewed to determine the interbank checks that had been written on Third National accounts and deposited into the debtor's accounts at other banks but that had not yet been presented to Third National and debited from those accounts upon which they were drawn. Then, these outstanding interbank checks were subtracted from the net statement balances, which in effect treated the outstanding interbank checks as if they had been presented and paid. The resulting balance was called the "reconciled balance" at Third National for that day. Finally, the expert reduced the reconciled balance by any actual overdrafts that appeared on the bank statements for the various Third National accounts, based upon the rationale that the actual overdrafts were "authorized loans" generated through the check kiting scheme. Wolff deposition, pp. 11–29.

Under that *Montgomery* standard, there is proof offered by these defendant banks that the greatest extent of the kite on April 12, 1993 at UP was $16,854.37, and that the greatest extent of the kite on April 27, 1993 at FSB was $35,560.59 in one account and $14,500.15 in the second account. Affidavits of Bobby R. McDonald and Nancy Bradley. The trustee did not provide this court with any factual or expert testimony, nor did the trustee provide any legal authority where a court has used or should use the method advocated by the trustee in his complaints and in mere unsupported argument in his memoranda, which method simply adds all of the interbank checks written during the preference period to yield a total possible preference of $253,875 as to UP and of $296,900 as to FSB. At oral argument on the summary judgment motions, counsel for the trustee conceded that there is no authority for the trustee's position. In contrast, the banks have offered affidavit proof from Bobby R. McDonald, Deposit Services Manager of UP, and from Nancy Bradley, Lending Administrator of FSB. Each calculated the maximum kiting overdraft under the *Montgomery* expert's method and under their own "pro forma" basis. On May 6, 1997, the day of the oral argument of the summary judgment motions, the trustee's counsel filed a written objection to the court's consideration of the affidavits of Ms. Bradley and Mr. McDonald, saying that the banks had not disclosed that they would have expert witnesses and that the affidavits contained hearsay. Ms. Bradley's affidavit has been on file since March 17, 1997, and Mr. McDonald's affidavit has been on file since February 10, 1997, and the trustee's objection appears to be untimely.

Moreover, when the trustee filed a memorandum in response to the banks' motions and in support of the trustee's motion on April 15, the trustee attached Mr. McDonald's affidavit and referred to it in the memoranda without objection.

■ Each of the affidavits, which are similar in form and often identical in language, make reference to the witness's analysis of that witness's bank's records of the debtor's accounts, and the affidavits refer to the normal course of banking business of each bank, a matter within the personal knowledge of each witness. The method used for calculations of the maximum artificially created balance by the check kiting is identical in each affidavit, and that method is a mathematical calculation requiring no special expertise. The trustee has not challenged the factual accuracy of the witnesses' calculations under either the *Montgomery* or pro forma methods. It is only when the affidavits refer to a comparison of the witness's calculation with the method used in the *Montgomery* case by Mr. Wolff, an expert witness, that the affidavits may refer to hearsay. The court is not persuaded that the references to Mr. Wolff's method are hearsay, because the affidavits do not rely upon Mr. Wolff's testimony or method to "prove the truth of [any] matter asserted" in these proceedings. FED.R.EVID. 801(c). Under the banks' principal theory that any transfers to them were in satisfaction of secured debt, the amount of the transfers makes no difference. Mr. McDonald and Ms. Bradley merely calculated the maximum possible preference under Mr. Wolff's method to illustrate the possible difference in the two methods, in the event the court did not accept the secured creditor argument. The difference becomes insignificant if the three accounts at the two banks are considered together for purposes of calculating a "combined unauthorized loan" for each day of the preference period, because the "combined unauthorized loan" would be a maximum of $49,907.17 on April 27, 1993, under either the Wolff method or the pro forma method applied by McDonald and Bradley. McDonald affidavit, p. 6. The court notes again that the trustee did not produce any proof, expert or otherwise, to shed light on the appropriate method for calculation of the maximum overdraft. In light of the lateness

of the trustee's objections, the absence of hearsay in the meaningful portion of the affidavits, and the presence of other proof of the expert's method, the court overrules trustee's objection.

Under the pro forma method used by Mr. McDonald and Ms. Bradley, the greatest overdraft was calculated for each account by a four-step analysis: 1) ascertaining the debtor's bank statement balance at the beginning of the preference period, which was assumed to be February 10, 1993; 2) adding to the beginning balance the amount of funds deposited into the account from outside, non-kite sources from the beginning of the preference period to April 27, 1993; 3) determining the amount of checks and other debits drawn on the account and payable at the direction of the debtor to third party or non-bank creditors; and 4) deducting these third party payments for the entire preference period from the balance yielded by step 2. When this calculation was made for each day of the preference period, the greatest overdraft at UP was $56,746.43 on April 27, 1993, according to Mr. McDonald's calculation. McDonald affidavit, pp. 4–5. Using the same method, Ms. Bradley's affidavit asserts that the greatest overdraft at FSB would be either $269.71 on April 20, 1993, if the accounts are looked at separately, or –0– if the two FSB accounts are combined. Under this calculation, the maximum preference to FSB would be protected fully by the earmarked deposit. UP concedes that $49,745.73 of the $60,000 loan deposit went to pay the debtor's FSB checks that had been deposited in UP's account. Under the McDonald pro forma calculation, subtracting this $49,745.73 transfer of funds from the maximum unauthorized loan of $56,746.43 yields a maximum possible unprotected preference to UP of $7,000.

Applying the Wolff method, which UP argues is not appropriate, UP admits that the maximum daily kite would be $16,854.37 on April 12, 1993. FSB's maximum kite, under the Wolff calculation method and combining the two FSB accounts, would be $50,060.74. A maximum preference avoidance under the Wolff method, therefore, yields a total at the two banks of $66,915.11, of which $60,000 would be protected by the earmarked loan,

resulting again in less than $7,000 of potential avoidable transfers.

The trustee's idea of simply adding all of the checks written on the two banks' accounts and deposited in the other bank during the preference period has no basis in either fact or law. It is simplistic but falsely assumes that every check so written and deposited was unsupported by the debtor's legitimate funds. A factual analysis of the checks is required rather than unfounded assumptions. Again, the trustee offered no facts, no testimony, and no expert to support the bare argument. The trustee invited the court, if it did not agree with the trustee's argument, to rely upon the *Montgomery* expert's method. In contrast, the banks produced factual proof, as well as the expert proof from the *Montgomery* trial and prior case authority, to support the arguments that the only methods for calculating the maximum possible overdrafts were found in two approaches other than the trustee's unsupported one. Under either the *Montgomery* or pro forma calculation method, the possible preference that would be unprotected by the earmarked loan would be minimal in amount.

## BANKS AS SECURED CREDITORS

█ Other than conclude that the trustee's method is unsupported by facts or law, the court will not decide which method of calculation, the McDonald/Bradley pro forma or the Wolff method, is mandated in this case because under any of the calculations, including the trustee's, neither bank received more than it would have received in a chapter 7 liquidation. This conclusion is based upon the statutory secured position of the banks. TENN.CODE ANNOT. § 47–4–210. The banks argue that they did not receive payment on any antecedent debt. The court is not persuaded that the proof before it establishes that debt was created upon each use of provisional credit in this case; however, rather than unnecessarily decide that or require further proof, the court will assume that transfers in satisfaction of antecedent debt were made and will then conclude that such transfers, as a matter of law, were in satisfaction of existing security interests.

The trustee argues that the Sixth Circuit's *Montgomery* opinion controls this aspect of the proceeding, and the trustee would read into *Montgomery* a holding that a bank in the position of these two defendants can never be a secured creditor in the items constituting a deposit. *Montgomery* simply does not provide such authority because the issue of a bank's secured status in deposit items [3] was not addressed in the *Montgomery* opinion. A comparison of the facts in *Montgomery* with the facts in the present proceedings will be helpful. In *Montgomery* the debtors had been engaged in a massive kiting scheme involving several banks and accounts, including the Third National Bank in Nashville. The level of "unauthorized loans" resulting from those debtors' kiting scheme reached a one day high of $2,000,000. Third National knew of the kiting during the preference period, in contrast to the lack of knowledge on the part of UP and FSB here, in time to benefit from the debtors' shifting of the kiting activity to other banks. Third National had set up the debtors' accounts in a manner that would enable the debtors to take advantage of "days of float." and the bank had established a one half million dollar line of credit with those debtors to secure anticipated overdrafts. Those debtors used the daily uncollected balances in a manner that demonstrated not only the use of uncollected funds but the use of the line of credit, to the extent that the entire line of credit was consumed and then was converted to a term note. In addition to this obvious antecedent debt, that bank made charges against those debtors' accounts for the use of uncollected funds, to the extent of $30,000 in "analysis" charges in one month. Not surprisingly, the bankruptcy court found Third National to be a creditor of the debtors, with an antecedent debt that was satisfied when Third National was paid after "extracting" itself from the kiting scheme. 23 B.R. at 803–807. The district court agreed and affirmed. *In re Montgomery*, 136 B.R. 727 (M.D.Tenn.1992). Within a short time from the shift of the kite away from Third National, that bank's "unauthorized loans" were paid in full, "the debtors having paid off [Third National] with

3. An "item" is "an instrument or a promise or order to pay money handled by a bank for collection or payment," a definition that includes a check. TENN.CODE ANNOT. § 47–4–104(a).

commingled funds generated partly through legitimate business activities and partly through the kiting of checks at other banks." *In re Montgomery*, 983 F.2d at 1389–90. The preferential transfers to Third National occurred after Third National had knowledge, at which point those debtors' kiting was shifted away from Third National to other banks, leaving Third National not merely in the position of an innocent depositary or collecting bank but a knowledgeable third party creditor of the debtors.[4] Third National was found to have had an antecedent debt that was paid by the debtors' use, in part, of kited checks drawn on other banks. The *Montgomery* Courts held that the debtors had depleted their estates when non-earmarked funds were used to pay Third National in preference to other creditors. The argument that Third National was a secured creditor in deposited items was not discussed in *Montgomery*, and under the particular facts of that case, such an argument may not have been appropriate.[5] Had it been argued, for example, the proof may have established that Third National's claim to a secured position would have failed due to its lack of "holder in due course" status. TENN.CODE ANNOT. § 47–4–211 and § 47–3–302.

In contrast, here the two defendant banks were unaware of the debtor's kiting activity until the end of that scheme, when the debtor was confronted by his employer bank, FSB, with the evidence of the scheme. At that point, the real beneficiaries of the debtor's activity had been the third party creditors who had been paid during the preference period and as a result of his check writing activity. The two banks were not participants in any shifting of the kiting from them to another bank. No payments were made to these two banks at the expense of any other creditors or any other banks. Upon the discovery of the kite by the banks, the debtor, who acknowledged that he knew that day would come, immediately obtained a loan from his uncle and deposited the earmarked

funds into his accounts at FSB for the sole purpose of clearing the overdrafts which would have existed on that day at the two banks. The debtor's estate was not depleted by the earmarked payment to eliminate the overdrafts at these two banks.

■ There is no doubt that both banks extended immediate provisional credit to the debtor upon his deposits, and this was in conformity with established bank practices. There is no proof that either bank treated the debtor's use of provisional credit as unauthorized loans. Neither bank, for example, made loan or analysis charges. No separate line of credit, as existed in *Montgomery*, was created by either UP or FSB. Assuming that the debtor's use of the provisional credit is sufficient to create antecedent debts to the banks, such debts are nevertheless secured by the items supporting each deposit. The *Montgomery* Court did hold that a debtor's use of unauthorized loans generated from the use of provisional credit in a bank account could constitute property in which the debtor had an interest, and this court agrees. The *Montgomery* Court held that those debtors' kiting at Sovran Bank in order to generate funds for payment to Third National produced property of the debtors that was transferred to Third National in payment of an antecedent debt. This court agrees. That does not mean that a bank will always lose to the trustee under a *Montgomery* analysis. Every preference proceeding is by its nature fact driven. As Judge Lundin stated it: "Under the [Bankruptcy] Code's expanded concept of debt [referring to § § 101(5), (10), and (12) ], a customer's contingent liability to repay its bank for the use of provisional credits *if the underlying items prove uncollectible* is a right to payment that would support preference avoidance on appropriate facts." *In re Montgomery*, 123 B.R. at 811 (citing TENN.CODE ANNOT. §§ 47–4–207, 208, 212, 414)(emphasis added). As this statement indicates, when a collecting bank acts

4. A "depositary bank" is the "first bank to take an item [for deposit] even though it is also the payor bank," a "payor bank" is "a bank that is the drawee of a draft," and a "collecting bank" is "a bank handling an item for collection except the payor bank." TENN.CODE ANNOT. § 47–4–105(2), (3), (5).

5. In the context of recognizing the existence of an antecedent debt, Bankruptcy Judge Lundin acknowledged, however, that a bank is a secured creditor "to the extent it gives provisional credit to its customer." *In re Montgomery*, 123 B.R. at 811 (citing TENN.CODE ANNOT. § 47–4–208).

in its normal course to collect deposited items, the collection satisfies the security interest in the deposit item. Under the facts of *Montgomery,* the transactions satisfying antecedent debt were not normal bank collection activity, and avoidance of the transfers to the bank was justified. Under the facts of the present proceedings, avoidance of any transfers to these banks is not justified.

The *Montgomery* opinions are excellent authority not only for avoidance and recovery from a bank that knowingly benefits from a kiting scheme, but also for the following scenario: Had this trustee sued the third party creditors who had benefitted from kited checks drawn on the FSB and UP accounts during the preference period. those third party creditors would have been unsuccessful in an argument that it was not the debtor's property that paid them. This in fact was the argument rejected by the Seventh Circuit in *In re Smith,* 966 F.2d 1527 (7th Cir.1992), a case relied upon by the *Montgomery* Circuit Court.

In *Smith,* the non-bank defendant, who was paid with the debtor's check drawn on the provisional credit granted when the debtor made a deposit that ultimately was dishonored, argued that it was not the debtor's property used for payment. Instead, according to that argument, it was the depositary and collecting bank's property that was used to pay the third party creditor. The Seventh Circuit discussed the provisional credit that is routinely granted by a depositary bank to its customers, and that Court acknowledged that the depositary bank is a secured creditor by virtue of the Uniform Commercial Code. That Court then held that a debtor's use of that provisional credit to pay third party creditors was a sufficient exercise of control over the credit to demonstrate the debtor's property interest in that credit. The *Smith* Court understood correctly that the bank is routinely protected in such transactions by the Uniform Commercial Code's grant of secured status to the collecting bank; however, as to the debtor's use of the provisional credit, that court correctly held that the debtor had sufficient interest in that credit to support an avoidable transfer to the debtor's third party, non-bank, creditors.

The *Smith* Court cited the *Montgomery* District Court opinion for the proposition that a debtor's procurement of a loan by fraud does not alter the character of that loan as property in which the debtor has an interest. *In re Smith,* 966 F.2d at 1534, n. 11 (citing *In re Montgomery,* 136 B.R. at 733–34). The *Smith* opinion also endorsed the prime bankruptcy purpose served by a trustee's avoidance powers: "Ensuring that all creditors of the same class will receive the same pro rata share of the debtor's estate." 966 F.2d at 1535. In the present proceedings, this trustee ignores that FSB and UP are secured creditors, not of the same class as the unsecured creditors represented by the chapter 7 trustee.

Section 547(b)(5) is premised upon the Bankruptcy Code's acknowledgment that a valid security interest survives a liquidating bankruptcy, and to the extent that a creditor is fully secured, payment to that creditor in satisfaction of the security interest is not a preferential transfer. *See* 11 U.S.C. § 506(a); *Ray v. City Bank and Trust Co. (In re C–L Cartage),* 899 F.2d 1490, 1493 (6th Cir.1990). *Laws v. United Missouri Bank of Kansas City, N.A.,* 98 F.3d 1047 (8th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1432, 137 L.Ed.2d 540 (1997), is a recent recognition that banks in the position of these two defendants are secured creditors in the items supporting a deposit. That opinion relies upon Mo.Rev.Stat. § 400.4–210(a)(3), for which the comparable Tennessee statute, both adopted from the Uniform Commercial Code, is Tenn.Code Annot. § 47–4–210(a)(1)–(3). The Tennessee statute provides that a collecting bank, which also may be the depositary bank, is a secured creditor

in an item and any accompanying documents or the proceeds of either:

(1) in case of an item deposited in an account, to the extent to which credit for the item has been withdrawn or applied;

(2) in case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given, whether or not the credit is drawn upon or there is a right of charge-back; or

(3) if it makes an advance on or against the item.

TENN.CODE ANNOT. § 47–4–210(a).

As the *Laws* Court recognized, to ignore the statutory security interest would undermine the banking industry, in which depositary banks routinely grant provisional credit upon the deposit of items into an account. The *Smith* Court earlier had acknowledged this secured position, stating that a bank does not bear the ultimate risk of nonpayment of deposited items: rather, the bank's customer must bear that ultimate risk. *In re Smith,* 966 F.2d at 1531. Banks will sometimes bear an actual loss if the customer fails to deposit an amount sufficient to cover a previously dishonored deposit, but that potential result only means that the bank's security had no value in such a case.

The *Laws* Court identified that the bank maintained both a ledger balance and a collected funds balance on that debtor's account. The ledger balance reflected the total deposits, both collected and uncollected, less debits such as checks presented for payment. The collected funds balance reflected "collected funds less debits to the account." 98 F.3d at 1049. The bank's routine practice, consistent with accepted bank procedure, was to "pay checks drawn on a customer's provisional credit," which was reflected in the ledger balance, and to "refuse to pay only if paying would result in a negative *ledger* balance." *Id.* (emphasis in original). After the bank had paid checks drawn on the ledger balance and if sufficient amounts of those checks were ultimately dishonored, the bank could find the account with both negative ledger and collected funds balances. That occurred in *Laws,* and the specific argument by that trustee was that the debtor's depositary bank was the recipient of payment on an antecedent debt when the debtor, as a customer of that bank, deposited sufficient money to eliminate a negative collected funds balance. That Court recognized that a dishonored deposit is not always worthless. and that kited checks are not worthless until the kite collapses. In *Laws,* when the debtor made a deposit in an amount sufficient to eliminate the negative collected funds balance the bank's position was not improved because the bank was a secured creditor holding security in the deposit items. That bank did not receive payment on an unsecured debt when the debtor made a deposit to satisfy the negative collected funds deposit; rather, the bank's security interest was satisfied by that debtor's deposit.

This is the same scenario presented in the present proceedings. Both UP and FSB were the holders of security interests in each item supporting deposits into accounts by the debtor at those banks. The proof does not establish that the majority of deposits were dishonored. Until the kite was discovered, all interbank deposits were collected. Assuming, however, the existence of a temporary negative collected funds balance in either bank's accounts, future deposits by the debtor in sufficient amounts to eliminate any negative collected funds balances merely satisfied the banks' security interests in prior uncollected deposit items. The trustee is reading *Montgomery* too broadly to construe it as authority for ignoring Tennessee's version of the Uniform Commercial Code. To hold as the trustee would ask this court would not only ignore applicable Tennessee law and § 547(b)(5)'s acknowledgment of such laws, but also would ignore the realities of the banking industry, with the ultimate result being that banks would not grant provisional credit to customers upon any deposit, waiting instead until the deposited items were collected.

The trustee argues that "the deposit of the kited check is a fraud and unlike the deposit of a legitimate check, represents no actual funds *or property interest* of the debtor to which a security interest could attach." Trustee's Memorandum, p. 5 (emphasis added). Citing *Montgomery,* 983 F.2d at 1395, the trustee further argues that it is the debtor's exercise of control over the provisional credit accorded the fraudulent deposit that creates the debtor's property interest. Assuming the latter to be true, that does not prevent the creation of the security interest under TENN.CODE ANNOT. § 47–4–210. Even if that security interest did not attach until the debtor had an interest in the provisional credit, it attached immediately upon the debtor's use of the credit. TENN.CODE ANNOT. § 47–4–210(a)(1). And, the security interest continued until it was satisfied by the subsequent deposit of sufficient funds or until it was otherwise paid. TENN.CODE ANNOT.

§ 47–4–210(c). Under the undisputed facts of this case, when the two banks granted provisional credit to the debtor upon his various deposits, the debtor's checks to other creditors were honored.[6] The banks gave value for the deposits when they honored checks drawn on those deposits. The debtor continued to make deposits into his accounts at each bank, which deposits were honored until his kite collapsed. It can not be said that the items supporting the various deposits before that collapse were worthless, as each bank honored checks drawn on the other bank until the kite was discovered. When the kite collapsed, the banks were left temporarily with uncollected funds' balances, but they each were the holders of security interests in the items supporting the uncollected deposits, and those items proved to have value. There is no proof that either bank was less than a holder in due course. TENN. CODE ANNOT. § 47–4–211 and § 47–3–302. The debtor obtained the loan from his uncle that was used to make sufficient deposits to eliminate the negative balances at both banks. At that point, the banks' security interests were satisfied and the banks were made whole. TENN.CODE ANNOT. § 47–4–210(c). Contrary to *Montgomery's* facts, these banks did not benefit from any funds that they had reason to suspect or know were illegal or tainted.

The trustee argues that even if the banks were secured their interests were unperfected and junior to the trustee's § 544 claims. Two problems arise with this argument. The applicable Tennessee law, which creates the secured position, does not require any perfection beyond possession of the deposit items. In fact, the statute specifically states that "no security agreement is necessary to make the security interest enforceable; no filing is required to perfect the security interest; and the security interest has priority over conflicting security interests in the item." TENN.CODE ANNOT. § 47–4–210(c)(1)–(3). As the comment to the Uniform Commercial Code indicates, the collecting bank that makes advances on paper held for collection acquires a common law possessory lien for those advances. Comment 1 to TENN.CODE ANNOT. § 47–4–210(a). Moreover, the trustee did not sue either of these banks on a § 544 complaint.

## CONCLUSION

For the reasons discussed in this opinion, the court finds no disputed issues of material fact and concludes that the defendant banks are entitled to summary judgment. All transfers to the banks within the ninety day preference period were protected from avoidance attack by the secured positions enjoyed by the depositary and collecting banks. Moreover and in the alternative, to the extent of transfers of $60,000 to the banks resulting from the deposits of a loan from the debtor's uncle, such transfers were of earmarked funds that were not property of the debtor. The trustee's motions for summary judgment will be denied. A separate order will be entered in each proceeding.

---

6. There is no proof that these banks reversed any provisional credit. *Compare Ries v. Firstar Bank Milwaukee, N.A., et al. (In re Spring Grove Livestock Exchange, Inc.)*, 205 B.R. 149, 155 (Bankr.D.Minn.1997)(citing *Laws* and holding that reversal of provisional credit did not create an antecedent debt).